IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TRACY ANDERSON,

                 Plaintiff,                       OPINION & ORDER

     v.

                                                     13-cv-561-wmc

CAPT. OLSON, SGT. DAHLKE and
OFFICER LEVEY,

                 Defendants.

*Pro se* plaintiff and Wisconsin inmate Tracy Anderson was granted leave to proceed with this civil rights action arising out of the alleged seizure and destruction of his Holy Qur'an by the defendants. (Jan. 14, 2014 Opinion & Order (dkt. #12).) Specifically, Anderson alleges that: (1) Officer Levey confiscated his Holy Qur'an and refused to send it to his family despite Anderson's request; (2) after being informed of Anderson's request, Sergeant Dahlke chose to destroy the Holy Qur'an instead; and (3) Captain Olson knowingly acquiesced in his subordinates' misbehavior. Defendants subsequently moved for summary judgment. (Dkt. #24.) For the reasons explained below, the court will grant defendants' motion for summary judgment on Anderson's First Amendment free exercise claim, but will reserve at present on his Fourteenth Amendment due process claim, on which defendants did not seek summary judgment until their reply brief.

UNDISPUTED FACTS

## I.  The Parties

Plaintiff Tracy Anderson has been incarcerated at Waupun Correctional Institution ("WCI") since July 14, 2010.  He is a follower of the Nation of Islam ("NOI").  His Holy Qur'an is central to his religious beliefs, as is a book entitled "Message to the Blackman."

Defendant David Levey is employed by the Wisconsin Department of Corrections ("DOC") as a Correctional Officer II.  He began his employment at WCI in March of 1994 and has held his current position since March of 1996.  As the Segregation Property Officer at WCI, Levey's duties include the care and management of the property of all inmates in segregation.

Defendant John Dahlke is employed by the DOC as a Correctional Sergeant.  He began his employment with the State of Wisconsin in September of 1985 and has held his current position at WCI since January of 1999.  As the Segregation Property Sergeant at WCI, Dahlke's duties include overseeing the care and management of the property of all inmates in segregation.

Defendant James Olson is currently employed by the DOC as a Supervising Officer 2 (Captain).  He began his employment with the State of Wisconsin on March 4, 1996, and he has been employed in his current position at WCI since July 5, 2009.

## II. Institutional Policies

### A. Excess Property

The growth in the inmate population over the last 20 years has caused overcrowding in many DOC institutions, including WCI.  Overcrowding already requires doubling inmates in cells and expanding additional housing areas, so a clear limit must be placed on

2

the amount of property that inmates may possess and store in the institution.  To avoid overcrowding, DAI Policy #309.20.03(I)(B)(5) provides that "[a]ll personal property (excluding medically prescribed items, hobby materials, legal materials, electronic equipment, typewriters, fans or other large items) will be required to fit into a box measuring 32" x 16" x 16" or 8,192 cubic inches.  Canteen items are considered personal property and count toward the cubic inch limit."  Religious property counts toward those limitations as well.  (*See* Francis Paliekara Aff. Ex. 100 (dkt. #30-1) § I.B ("Religious Property is included in the allowable property limits specified in DAI Policy 309.20.03.").)  Inmates are responsible for keeping their property within the limits prescribed by policy.

When an inmate has property deemed to be contraband -- whether because it is over the property limit or for some other reason -- the property is separated and documented.  Staff notifies the inmate by giving him a list of the items deemed contraband and the reason for the decision on a DOC-237 Property Receipt/Disposition form.  At that time, the inmate can decide either to dispose of the property or to send it out at his own expense.

The parties agree that the Property Department does not have enough space to store excess inmate property indefinitely.  For this reason, an inmate has thirty days to return the DOC-237 with his decision.  If an inmate does not notify property staff of his choice within thirty days, his non-response is considered a refusal to pay for the mailing of his property, and WCI disposes of it accordingly.

If, on the other hand, an inmate wishes to send out his property, he must send a disbursement request to property staff with instructions as to where to send the excess property.  That step is necessary so that staff has authorization to use the inmate's funds to

pay shipping costs.  If the inmate does not submit a valid disbursement requests within the thirty-day period, officials also dispose of the property.[1]

Importantly, inmates may only receive new books and publications directly from approved vendors and publishers.  Thus, if an inmate chooses to send out his excess books, he may not receive any of them back at the institution afterward.

### B. Property in Segregation

When an inmate is placed in segregation, his property is packed and placed in storage until he returns to general population.  All the property is secured and stored in the property room until it is inventoried and officials determine that it is within allowable limits.  Inmates in segregation are restricted from having as much property as inmates in general population.  For example, under DAI Policy #309.20.03, an inmate in general population may possess a combined twenty-five books and publications, but an inmate in segregation may possess only four books and publications.[2]

Publications are not automatically sent to inmates in segregation; they must request the publications they wish to have by writing to the Property Department.  According to defendants, an inmate may designate in his request the four specific books he wishes to

---

[1] If an inmate wishes to send out his property, he must have sufficient funds in his account.  If he does not have sufficient funds to cover the cost of postage for all of his property, he can request only certain property be sent out by providing a disbursement request to that effect.

[2] Anderson argues in his brief that DOC rules "don't allow officers to destroy Qurans," but he offers no authority to support that proposition, and the court can find none.  To the contrary, DAI Policy 309.61.02 states that religious property is included in the allowable property limits specified in DAI Policy 309.20.03.  That section in turn includes the limitations on publications (twenty-five in general population, four in segregation); states that a "[r]eligious text is considered a personal publication"; and provides that, when an inmate is sent to temporary lock-up, staff will check all property and "[f]ollow procedures in procedure section X.C for items deemed contraband."  Section X.C indicates that inmates must decide within 30 days whether to dispose of or mail out contraband.

keep as allowable segregation property, although the books he selects must be softcover. The WCI Segregation Handbook specifically provides that religious textbooks are allowed in segregation as part of the four permitted books and publications. If an inmate does not receive his religious textbook while in segregation, he may not only request it from Property, but may also request assistance from the Chaplain.

### C. Inmate Religious Practices

Generally, inmates may exercise their religious beliefs and practices in a variety of ways, including: (1) congregate services; (2) religious diet requests; (3) individual study; (4) personal meditation; (5) utilization of religious books and property; (6) celebration of religious feasts; (7) individual observance in living quarters; (8) correspondence with fellow believers; (9) pastoral visits; and (10) requests to abstain from work or program on religious days of observance.[3]  As noted above, inmates may possess approved religious property associated with their designated religious preference, so long as it does not present a threat to institutional order and safety.  Like non-religious property, however, this property must comply with the DOC's property policies, including DAI Policy 309.61.02, "Religious Property."

The WCI Chapel maintains a library of religious books and publications for inmate use.  An inmate may at any time request to use a religious book or publication maintained in the chapel.  While religious publications are not restricted to an inmate's identified religious preferences, inmates who identify Islam as their preference often utilize a Qur'an as their religious textbook.  The library has a number of Qur'ans available for inmate use

---

[3] Anderson purports to dispute this fact, stating that it is untrue "when applied to plaintiff and his religion," but he offers no evidence placing it into dispute.

both in general population and segregation, although Chaplain Paliekara does not recall exactly how many were available for inmate use during May and June of 2013. Anderson appears to concede that the library has various Qur'ans available for inmate use, but he argues that none is the version needed to practice as a member of the Nation of Islam.

WCI also allows inmates who have chosen Islam as their religious preference to participate in the traditional Ramadan fast, an Islamic celebration held during the ninth month of the Islamic lunar calendar. During this month, Muslims around the world spend the daylight hours in a complete fast. The DOC 2013 Ramadan fasting involved total abstinence from all food and drink during the daylight hours beginning on July 9, 2013, and ending after sunset on August 7, 2013. Inmates participating in the fast receive two "bag" meals per day: one to consume before sunrise and one to consume after sunset. The Food Service Department generates a list of inmates who elect to participate in the Ramadan fast. Anderson was not on the list as of July 9, although he claims to have fasted on his own during that time.

## III. Facts Specific to Anderson's Claim

### A. Placement in Segregation and Communications with Property Office

On May 6, 2013, Anderson was transferred to the segregation unit. His property was inventoried on May 9 by Correctional Officer Feucht, who determined that Anderson had fifty-six books and publications, thirty-one over the twenty-five book limit for the general population and fifty-two over the four book limit for segregation.[4] Defendant Levey, as the segregation property officer, would have been responsible for going to the

---

[4] The parties dispute whether Anderson had an additional two books that were not his, but that dispute is not material.

segregation unit and delivering inmates' property and property documents.  Although he does not recall this specific incident, Levey indicates that pursuant to his ordinary routine, he would have gone to segregation to notify Anderson of the contraband property, including the publications that were over the limit, and would have requested that Anderson fill out and return the DOC-237 form.  Anderson does not dispute this description of events and has in fact averred that Levey came to segregation on his daily run on May 13, 2013.

The parties' main dispute is whether Anderson actually informed anyone at WCI that he wished to mail out his over-the-limit property and, if so, whether he took the required steps.  Anderson has averred that sometime after May 13, when Levey came to segregation, Anderson filled out both a disbursement request and the DOC-237 form requesting that the contraband property be mailed out.  (Tracy Anderson Aff. (dkt. #35) ¶ 2.)  In response, Levey avers that he does not recall Anderson ever making such a request.  Moreover, on the DOC-237, Levey noted "ICI," which indicates that Anderson stated his intent to file an offender complaint.  Pursuant to policy, if an inmate is going to file an offender complaint, the property in question will be held for inspection by a complaint examiner, although the inmate must inform property staff of the offender complaint number.  The inmate must still return the notice within the original thirty day deadline, either by providing an accepted complaint number or by notifying property staff of the desired disposal method.

Anderson's affidavit leaves unclear the exact point in time at which he allegedly filled out a request slip and money disbursement, although his choice of words suggests that he did so immediately after Levey came by his cell on May 13.  (Tracy Anderson Aff. (dkt. #35) ¶ 2 ("[O]n 5-13-2013, Sgt. Levey came to segregation on one of his daily runs . . . I

then filled out a request slip and money disbursement telling property to mail out my contraband property.").)  Anderson agrees, however, that Levey wrote "ICI" on the DOC-237, and the record also contains a request slip written by Anderson and dated May 15, 2013, addressed to Captain Olson, which states that he  had decided not to file a complaint and wanted to mail out his property.  (*See* Linda G. Alsum-O'Donovan Aff. Ex. 107 (dkt. #31-3) 16.)

Given this evidence, the most favorable inference that can reasonably be drawn in Anderson's favor is that at some point after May 15, he submitted the required request slip and money disbursement form, since before that date, his own evidence states that he was going to file an inmate complaint.  (*See, e.g.*, Tracy Anderson Aff. (dkt. #35) ¶ 13 (averring that he was originally going to file an inmate complaint about his contraband books).)

There is, however, a dearth of evidence in this record regarding Anderson's actual request.  Levey does not remember Anderson asking him to send his property out, and even Anderson's own affidavit does not swear he did so verbally.  (*See* David Levey Aff. (dkt. #28) ¶¶ 12-13; Tracy Anderson Aff. (dkt. #35) ¶ 2.)  In fact, Anderson does not dispute that the "ICI" note on the DOC-237 indicates that he told Levey he planned to file an offender complaint.  Captain Olson does not recall receiving Anderson's May 15, 2013 request slip indicating he no longer planned to file a complaint and has no record of receiving it.  Moreover, the request slip in the record has a stamp indicating it was "Inmate Submitted" on July 1, 2013, apparently as an exhibit to the inmate complaint that Anderson filed after his property was destroyed.  (*See* Compl. Ex. (dkt. #1-1) 3.)  Finally, WCI as a whole has no record of receiving a disbursement request from Anderson in May or June of 2013.

According to Anderson's trust account statement, on May 15, Anderson had a balance of $15.21, after two deposits of $12 and $13 that same day, and Anderson never requested his Holy Qur'an be provided to him while in segregation.

**B. Release from Segregation and Destruction of the Property**

Anderson was released from segregation on June 14, six days before his confiscated property was destroyed.  While he would have received his *allowed* property back within a few days, he would not have received property over the allowable limit -- including the extra thirty-one books and publications.  According to Anderson's property records, he also signed for a new copy of the Qur'an, received from an approved publisher, on June 17, 2013, a few weeks before Ramadan began.

On June 20, 2013, Defendant Dahlke destroyed Anderson's contraband property, including the thirty-one books and publications that were over the limit, by disposing of it in the trash receptacle.  (Pl.'s Resp. DPFOF (dkt. #33) ¶ 41.)  There is no dispute that he did so pursuant to policy, because the property had been in the Property Department for more than thirty days (indeed, the June 20 date was beyond the ordinary thirty-day limit).  The Property Receipt/Disposition form indicates that the property was destroyed due to no contact from Anderson, although as described above, Anderson disputes defendants' contention that he never contacted the Property Department.

There is no record of the specific books and publications that Dahlke destroyed on June 20; the form indicates only that thirty-one publications were over the limit.  Dahlke suggests that he was unaware that any of the destroyed books contained religious content,

including Anderson's Qur'an.  (*See* John Dahlke Aff. (dkt. #27) ¶¶ 15-17.)[5]  According to Dahlke, the Property Department does not have time to inventory by name, date or issue all books and publications for every inmate, and doing so would create a huge burden on staff due to lack of resources and availability.   In response, Anderson points to DAI Policy #309.20.03, IV.A.1.a., which mandates that staff "ensure there is a complete and total inventory of all personal property in the inmate's possession."  Regardless of what policy *requires*, however, it appears that there was no record of the titles of the books the Property Department had in its possession.

### C. Communications with Property Department after Release from Segregation

According to Anderson, on June 25, 2013, he sent Dahlke an Interview/Information Request stating:

> I am writing you because I spoke with you about sending my property out on the 20th June but I didn't have the funds in my account and you told me you will hold on to my property until I get the funds.  So I would like to send my property out because I have the funds now.  Thank you!

(Compl. Ex. 5 (Dkt. #1-1) 11.)  Dahlke has averred that he does not recall ever having such a conversation with Anderson and has no record of receiving the June 25 request.  Dahlke also denies that he would ever promise an inmate to hold his excess property until he had sufficient funds to mail it out, as that would violate DOC policy.  Even so, Anderson continues to maintain that the conversation occurred, although his affidavit offers no details

---

[5] Anderson argues that Dahlke intentionally destroyed the Qur'an and the "Message to the Blackman" book, but he has produced no evidence to support that proposed fact.  (*See* Pl.'s PFOF (dkt. #34) ¶ 11.)  Nor does he provide supporting evidence for his assertion that the destruction of his two most religious books "was not random."  (*See id.* at ¶ 23.)

about what Dahlke actually said, and his correspondence makes no mention of religious property, including his Qur'an.  (Tracy Anderson Aff. (dkt. #35) ¶ 11.)

The next day, Anderson sent an Interview/Information Request to Olson in which he claimed that Dahlke had destroyed his property despite being told that Anderson wanted to send it to his family.  Olson's response notes that property is held for thirty days and disposed of after that.  Olson has averred that he was not aware that Anderson was missing a Qur'an until this point, after Dahlke had already disposed of it.

Anderson filed an offender complaint, WCI-2013-12887, regarding the disposal of his property.  Although Anderson alleged in this lawsuit that Levey lied to the Institution Complaint Examiner during the investigation of the complaint, telling the Examiner that Anderson lacked sufficient funds to send out his property, the offender complaint itself indicates that only Dahlke was contacted by the Examiner during the investigation.  As Anderson now concedes, Levey would not have had personal knowledge regarding inmate funds and would, therefore, not have told the Examiner that an inmate *lacked* sufficient funds to send out property.


OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323. Although Anderson will be given an opportunity to come forward with additional evidence on his due process claim, defendants are entitled to summary judgment on his First Amendment claim.

## I.  Free Exercise Claim[6]

Pursuant to the Free Exercise Clause of the First Amendment, "[a]n inmate retains the right to exercise his religious beliefs in prison." *Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005). To establish a claim for violation of the Free Exercise clause, Anderson

---

[6] In screening Anderson's complaint, the court noted that Anderson's claims "pass[ed] muster under the more permissive standard" of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") as well. However, Anderson requested only monetary relief in his complaint, and money damages are not available in RLUIPA suits. *See, e.g.*, *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011); *Nelson v. Miller*, 570 F.3d 868, 889 (7th Cir. 2009). Moreover, Anderson never amended his complaint to request injunctive relief, despite being given an opportunity to do so.

must first produce evidence that his right to practice his religion "was burdened in a significant way." *Id.* at 683.  This means that he must show defendants have imposed a burden on him "that necessarily bears a direct, primary and fundamental responsibility for rendering religious exercise . . . effectively impracticable."[7] *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 761 (7th Cir. 2003).

Defendants dispute neither that Anderson is a follower and believer of the Nation of Islam, nor that the Holy Qur'an and the book "Message to the Blackman" are central to his religion.  They do argue, however, that the destruction of Anderson's Qur'an did not substantially burden his religious exercise.  In support, defendants point out that contrary to the allegations in his complaint, Anderson *did* have a Qur'an during the month of Ramadan.  Indeed, Anderson acknowledges that he signed for a new Qur'an on June 17, 2013, the day after he was released from segregation.  (Pl.'s Resp. DPFOF (dkt. #33) ¶ 77.)  This wholly undermines Anderson's original complaint that defendants substantially burdened his religious practice by eliminating his ability to read the Qur'an during the month of Ramadan.  (*See* Compl. (dkt. #1) 10.)

---

[7] Defendants also argue that they are entitled to summary judgment because they did not target Anderson's religion but instead enforced a law of general applicability, and the First Amendment does not require religious accommodation in prison.  That rule comes from *Employment Division v. Smith*, 494 U.S. 872 (1990).  As recently as 2013, the Seventh Circuit recognized that in the prison context, "[w]hether there is a constitutional as distinct from a statutory right to a religious accommodation is an open question" due to the tension between *Smith* and decisions like *Turner v. Safley*, 482 U.S. 78 (1987), which "create a First Amendment duty of religious accommodation in prison." *Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013).  Case law from the Seventh Circuit appears to conflict on this point.  *Compare Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) ("The first amendment . . . does not require the accommodation of religious practice: states may enforce neutral rules."), *with Vinning-El v. Evans*, 657 F.3d 591, 593 (7th Cir. 2011) (declining to decide whether *Smith* applies to prisons and whether it supersedes *Turner* when a prisoner requests an accommodation).  Ultimately, while Anderson has produced no admissible evidence that defendants targeted his religion in any way, the court need not and does not rely on that basis to grant defendants' motion for summary judgment given the other flaws in Anderson's case.

Additionally, there is a real question as to whether Anderson can show the requisite causal link between defendants' alleged refusal to mail out his Qur'an and his inability to practice his religion.  Once placed in segregation, Anderson had three options with respect to his Qur'an: (1) ask to exchange one of the books he had in his possession for the Qur'an in storage; (2) mail the Qur'an home; or (3) authorize defendants to dispose of it.  The first option, which was within his power, would have ensured he had that particular copy of the Qur'an for Ramadan, but he has presented no evidence that he made such a request.  (Pl.'s Resp. DPFOF (dkt. #33) ¶ 55 (religious texts are allowed in segregation), ¶ 54 (Anderson never requested a Qur'an from property while in segregation).[8])

Furthermore, although Anderson blames defendants for destroying his Qur'an instead of mailing it out, it would have made no difference in terms of the books Anderson had during Ramadan even if defendants had complied with Anderson's wishes.  Per policy, inmates can *only* receive new books and publications from approved publishers; they are not permitted to receive used books.  (Pl.'s Resp. DPFOF (dkt. #33) ¶¶ 78-79.)  Thus, even presuming defendants engaged in the misconduct alleged by disposing of the Qur'an instead of mailing it out, it has no connection to the alleged burden on Anderson's religious exercise of which he complains.[9]

---

[8] Anderson asserts that this fact is "irrelevant," but offers no evidence placing it into dispute.

[9] The act of destroying the Qur'an itself may be viewed as a blasphemous desecration of holy text, *see* netlibrary.net/article/whebn0001901444/quran.desecration (last visited June 3, 2015), but Anderson did not assert this act violates his right to the free exercise of religion.  Instead, Anderson alleged that he did not have his Qur'an for Ramadan and so could not read it during that month.  On summary judgment, it has become clear that, once the Qur'an was confiscated, Anderson could not have gotten it back for Ramadan regardless of whether defendants disposed of it or mailed it out (unless he had asked to switch it for one of the books in his possession, which he undisputedly did not do).  Thus, the question is essentially whether defendants' *confiscation* of the Qur'an was reasonably related to a legitimate penological interest; what they did with it afterward ultimately has no bearing on the

14

Finally, defendants argue that even if they had substantially burdened Anderson's religious exercise by confiscating and disposing of his Qur'an along with the rest of the contraband in his cell, their actions were "reasonably related to legitimate penological interests" and therefore valid. *Turner v. Safley*, 482 U.S. 78, 89 (1987). On this record, the court agrees. "There are four factors that courts must consider in determining whether a prison regulation is constitutional: whether the regulation is rationally related to a legitimate and neutral government objective; whether there are alternative means of exercising the right that remain open to the inmate; what impact an accommodation of the asserted right will have on guards and other inmates; and whether there are obvious alternatives to the regulation that show that it is an exaggerated response to prison concerns." *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004) (citing *Turner*, 482 U.S. at 89-91).

Applying these factors, the prison regulation is constitutional. As an initial matter, correctional officials have a legitimate interest in avoiding overcrowding, saving staff resources and maintaining the security of the institution, and as Olson has averred, placing limits on the amount of property that inmates can have in their cells is reasonably related to that interest. *See Turner*, 482 U.S. at 92 (maintaining safety and internal security is "core function[] of prison administration"); *Lindell*, 377 F.3d at 659 (defendants had economic interest in saving staff resources); *Roberts v. Cohn*, 63 F. Supp. 2d 921, 927 (N.D. Ind. 1999) ("[T]aking typewriters and word processors off the list of permitted property serves the interest of reducing the amount of property kept in the inmates' cells.").

---

particular religious burden (denial of the Qur'an during Ramadan) that Anderson alleged in his complaint.

The regulation also left Anderson with viable, alternative means to exercise his rights, even assuming that none of the other permitted methods of religious observation sufficed. For example, while in segregation, he could have requested his own Qur'an from the Property Department.  If for some reason his confiscated Qur'an was not permitted in segregation -- for instance, if it was a hardcover book, which defendants concede is not allowed -- he could have ordered a new Qur'an from an approved publisher (which, in fact, he eventually did in this case).  Moreover, requiring guards to give inmates more in-cell property would have a negative impact on a prison, especially one that the parties agree is already overcrowded, and mandating that they mail out confiscated religious property in the absence of a timely request and payment by the inmate unreasonably shifts the burden of identification, logistics and shipping costs to the institution.

Finally, Anderson suggests no obvious alternatives to the current property policies in place.  Indeed, the notion of limiting the volume of property was itself suggested as a reasonable alternative to a blanket ban in *Lindell*.  377 F.3d at 660.  In light of the above, even if Anderson had produced evidence of a substantial burden on his religious practices due to defendants' confiscation of his Qur'an, the property regulations he challenged would pass scrutiny under *Turner*.

Perhaps recognizing that his claim as originally pled falters, Anderson seeks in his brief to change the focus of this case.  He contends that the "allegation that [he] preferred to have sent his books out is a concern, but it is not his claim that is being asserted here." (Br. Opp'n (dkt. #32) 2-3.)  Instead, he argues that the confiscation of his Qur'an is one of a number of "intentional acts" that officials have perpetrated against Nation of Islam members within the walls of WCI.  He also asserts new theories of liability premised on the

16

confiscation of another religious book, "Message to the Blackman," and on defendants'
failure to individually inventory all of his confiscated books.  If defendants had provided
him with a list of all of his confiscated books, Anderson contends, he would have known
that his religious texts were considered contraband.  Since he did *not* know, however, he
argues that defendants denied him the opportunity to "make a knowing choice" as to how
his property ought to be handled.  (*Id.* at 2.)

Because Anderson's new theories are not a proper part of this lawsuit, the court
expresses no opinion on their merits.  "[A] plaintiff 'may not amend his complaint through
arguments in his brief in opposition to a motion for summary judgment.'"  *Anderson v.
Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817
(7th Cir. 2002)).  Here, Anderson neither pled claims related to "Message to the
Blackman," nor challenged defendants' failure to list all of Anderson's confiscated
publications individually.  Similarly, the court did not grant Anderson leave to proceed on
any such claims.  Finally, defendants did not receive fair notice of these new bases for
liability.  Anderson cannot, therefore, change his focus now, at summary judgment, in an
attempt to rehabilitate his case, especially by asserting those new theories in his briefing.
*See id*. at 997-98.[10]

---

[10] Because Anderson has failed to come forward with evidence that defendants imposed a substantial
burden on his religious exercise, and because their actions were rationally related to a legitimate
penological objective in any event, the court need not consider defendants' alternative arguments
that an "isolated occurrence" is insufficient to sustain a First Amendment claim or that they are
entitled to qualified immunity.

## II. Due Process Claim

Anderson was also granted leave to proceed on a claim for violation of his Fourteenth Amendment rights, premised on the deprivation of his property rights in his Qur'an without due process of law.  Defendants made no mention of this claim in their opening brief.  (*See* Defs.' Br. Support Summ. J. (dkt. #25).)   In their reply, however, they ask the court to enter judgment in their favor on that claim as well.  (Defs.' Br. Reply (dkt. #36) 5-6.)

As the moving party, defendants had the initial burden of identifying their bases for seeking summary judgment.  *Costello v. Grundon*, 651 F.3d 614, 634 (7th Cir. 2011).  As non-movant, Anderson was not required to present evidence on an issue -- or claim -- not raised by the movants.  *Id.*; *see also Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision.").  Accordingly, it would not be proper for the court to enter summary judgment in defendants' favor without first giving Anderson an opportunity to respond to defendants' arguments on that claim, including coming forward with all relevant proposed finding of fact and record evidence on that point.  (*See* dkt. #41.)

ORDER

IT IS ORDERED that defendants' motion for summary judgment (dkt. #24) is GRANTED IN PART, consistent with the opinion above.

Entered this 4th day of June, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge